IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

NATIONAL ALLIANCE FOR            )
GRANDPARENTS AND CHILDREN'S      )
RIGHTS, INC. and                 )
JAMES BROWN,                     )
        Plaintiffs,            )            CIVIL ACTION
                                 )
v.                               )            Case No. 09-CV-2487-DJW
                                 )
UNIFIED GOVERNMENT OF            )
WYANDOTTE COUNTY, KANSAS;        )
COMMUNITY DEVELOPMENTAL          )
DISABILITIES ORGANIZATION OF     )
WYANDOTTE COUNTY, KANSAS;        )
and GORDON CRISWELL,             )
                                 )
        Defendants.            )

## MEMORANDUM AND ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment (ECF No. 73). For the reasons set forth below, the motion is granted.

## I. Background Information and Plaintiff's Claims[1]

Under 42 U.S.C. § 1983, Plaintiffs bring suit against the Unified Government of Wyandotte County, Kansas; Community Developmental Disabilities Organization of Wyandotte County, Kansas; and Gordon Criswell. Plaintiffs allege that Defendants violated the equal protection clause of the Fourteenth Amendment by unfairly administering the system of funding for the delivery of community services. More specifically, Plaintiffs allege that Defendants treated Plaintiffs differently than other similarly situated community care providers in the following ways: (1) Plaintiffs' funding from Defendants did not correspond with the degree of

---

[1] Because the Pretrial Order supercedes the prior pleadings, the Court will refer to Plaintiffs' claims as they are pled in the Pretrial Order. *Weyerhaeuser Co. v. Brantley*, 510 F.3d 1256, 1267 (10th Cir. 2007)("The subsequent pretrial order supercedes the pleadings.")(citing *Wilson v. Muckala*, 303 F.3d 1207, 1216(10th Cir. 2002)).

difficulty of its patients[2]; (2) Defendants reduced the "tier rate," or level of care designation, of its patients without justification, resulting in an initial reduction of funds, and that Plaintiffs only received the proper level of funds after an unreasonable length of time and much effort[3]; (3) Defendants applied the tier rate standards differently to patients under Plaintiffs' care compared to patients under the care of other service providers[4]; (4) Defendants gave improper preference to other care providers in referring patients to those care providers[5]; (5) Plaintiffs' clientele consists primarily of patients rejected by other care providers because of Defendants' biased and preferential referral practices[6]; (6) Defendants subjected Plaintiffs to unannounced visits and audits with greater frequency and scrutiny than other similar care providers for which Defendants were responsible.[7] Plaintiffs contend that Defendants are unable to demonstrate any rational basis justifying Defendants' disparate treatment of Plaintiffs compared to other similarly situated community care providers.  Plaintiffs also assert a state law claim under the Kansas Developmental Disabilities Reform Act ("KDDRA"), K.S.A. § 39-1801, et seq., similarly implicating the methods by which Defendants administer the system of funding.  Defendants move for summary judgment on both claims.

## II.  Standard for Ruling on a Summary Judgment Motion

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law."[8] In applying this standard, the Court views all the evidence and all reasonable inferences drawn

---

[2]  Pretrial Order entered December 12, 2011 at 5, ¶ 5(a)(1).
[3]  *Id., ¶* 5(a)(2).
[4]  *Id., ¶* 5(a)(3).
[5]  *Id., ¶* 5(a)(4).
[6]  *Id., ¶* 5(a)(5).
[7]  *Id., ¶* 5(a)(6).
[8]  Fed. R. Civ. P. 56(a).

from the evidence in the light most favorable to the nonmoving party.[9]  A dispute is considered "genuine" if there "is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[10]   An issue of fact is considered "material," if, under the substantive law, "it is essential to the proper disposition of the claim."[11]  When examining the underlying facts of the case, the court must view all inferences in the light most favorable to the nonmoving party,[12] and the court may not make credibility determinations or weigh the evidence.[13]

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[14]   In attempting to meet that standard, a moving party who does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the moving party need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[15]   In such cases, "[t]he moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."[16]

If the moving party carries this initial burden, then the nonmovant who would bear the burden of persuasion at trial may not simply "rest upon his or her pleadings, but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which

---

[9]  *Adler v. Wal-Mart Stores, Inc.* 144 F.3d 664, 670 (10th Cir. 1998)(citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Hirase-Doi v. U.S. West Commc'ns, Inc.*, 61 F.3d 777, 781 (10th Cir. 1995)).

[10]  *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[11]  *Id.* (citing *Anderson*, 477 U.S. at 248).

[12]  *Matsushita*, 475 U.S. at 587.

[13]  *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*, 527 F.3d 1045, 1050 (10th Cir. 2008)(citations omitted).

[14]  *Matsushita*, 475 U.S. at 57(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

[15]  *Id.* (citing *Celotex*, 477 U.S. at 325).

[16]  *Celotex*, 477 U.S. at 323.

he or she carries the burden of proof."[17]  Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative.[18]  A party opposing summary judgment "cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial."[19]  Put simply, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts."[20]

The parties need not present evidence in a form that would be admissible at trial, but the content or substance of the evidence must be admissible.[21]  For example, hearsay testimony that would be inadmissible at trial may not be included.[22]  Finally, the Court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed 'to secure the just, speedy, and inexpensive determination of every action.'"[23]

## III.  Facts

The following material facts are uncontroverted and relevant to the Court's resolution of the pending motion.   The Wyandotte County Developmental Disabilities Organization ("WCDDO") operates as a "community developmental disabilities organization" as that term is defined under the Developmental Disabilities Reform Act ("DDRA"),  K.S.A.  39-1801, et seq. Gordon Criswell is an Assistant County Administrator for the Unified Government, and has held this position since February of 2007.  Mr. Criswell is also the Executive Director of WCDDO,  and has held this position since 1998. Mr. Criswell has never manipulated any BASIS Assessments, tier rates or any other data, nor has he ever asked anyone else to manipulate

---

[17]  *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).
[18]  *Anderson*, 477 U.S. at 250-51.
[19]  *Conaway v. Smith*, 853 F.2d 789, 793 (10th Cir. 1988).
[20]  *Matsushita*, 475 U.S. at 586-87.
[21]  *See Thomas v. International Bus. Mach's.,* 48 F.3d 478, 485 (10th Cir. 1995)(internal quotations and citations omitted).
[22]  *Conoco*, 148 F. Supp. 2d at 1166.
[23]  *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

any BASIS Assessments, tier rates or any other data.  Mr. Criswell has never referred individuals to community service providers other than National Alliance and has never asked anyone else to refer individuals to community service providers other than National Alliance.

Kay Forwalder-Fasching is the Deputy Director of Human Resources for WCDDO. Ms. Forwalder-Fasching has held this position since May of 2011. Previously Mrs. Forwalder-Fasching was the Quality Assurance Administrator for WCCDO, a position that she held for eleven years.  Mrs. Forwalder-Fasching has never manipulated any BASIS Assessments, tier rates or any other data, nor has she ever asked any other person to manipulate any BASIS Assessments, tier rates or any other data.  Mrs. Forwalder-Fasching has never tried to refer any individuals to community service providers other than National Alliance. She also has never told other people that they should refer any individuals to community service providers other than National Alliance.

Community developmental disability organizations ("CDDO's") serve as the single point of entry for individuals or families to obtain services through the developmental disabilities system in Kansas.  CDDO's determine eligibility for developmental disability services within available resources. If funds are available, the organization is responsible to serve or arrange to serve eligible persons needing services in their area. If funding is not available, the individual is placed on a waiting list managed through that organization.

Kansans aged five and older who have a developmental disability and are Medicaid eligible may receive community-based services through the developmental disabilities waiver program.  The waiver program provides Medicaid funded services to individuals in their home communities who otherwise would be eligible for placement in an Intermediate Care Facility. Oversight and control of the waiver program is provided by the Kansas Department of Social and

Rehabilitation Services ("SRS") and at the federal level by the Centers for Medicare & Medicaid Services ("CMS").

National Alliance for Grandparents and Children's Rights ("National Alliance") operates as a "community service provider" as that term is defined under the DDRA. James Brown is the founder and Executive Director of National Alliance.   There are currently eleven licensed community service providers operating in Wyandotte County.   Individuals and families may choose their actual community service provider.

The BASIS Assessment Process

A.   Jatina Johnson – BASIS Coordinator and Assessor

 Jatina Johnson is a BASIS Coordinator and Assessor and works for Johnson Development Group, LLC. Ms. Johnson has held this position since May of 2011.  Previously, from February of 2007 until May of 2011, Ms. Johnson worked as a BASIS Coordinator and Assessor for Another Day, Inc.  Since February of 2007, Ms. Johnson has been contracted by WCDDO to perform BASIS Assessments for individuals seeking support services through the Home and Community-Based Services for the Mentally Retarded and Developmentally Disabled ("HCBS/MRDD") waiver program in Wyandotte County.

The term "BASIS" stands for "Basic Assessment and Services Information System." BASIS Assessments are used to determine whether individuals are eligible for services under the HCBS/MRDD waiver program.  As a BASIS Coordinator and Assessor, Ms. Johnson serves as a non-biased intermediary between the individual consumers, community service providers, case managers and WCDDO.

BASIS Assessments are performed once a year during the birthday month of the individual seeking services.  Prior to the BASIS Assessment meeting, Ms. Johnson calls the

individual's case manager or family member to coordinate the time and location of the meeting, and Ms. Johnson asks them to bring any updated information. Anyone who sees the individual on a regular basis can attend the BASIS Assessment meeting.  Ms. Johnson uses the "General Guidelines for BASIS Assessors" published by SRS when preparing the BASIS Assessments.

After the BASIS Assessment is complete, all of the people in attendance at the meeting have an opportunity to review the results. If anyone at the meeting disagrees with the results, Ms. Johnson will discuss those disagreements with them in order to see if their concerns can be addressed at the meeting. If the disagreement cannot be reconciled, there is a form attached to the BASIS Assessment which the person can sign and explain their disagreement.

WCDDO reviews any disagreements that were expressed by individuals at the meeting. When reviewing a BASIS Assessment, Mrs. Forwalder-Fasching will ask the provider for any written data or other information that they have to support the change that they are requesting. Reviewing a BASIS Assessment often requires that discretionary decisions be made regarding the information given by the provider and the answers contained in the BASIS Assessment. Ms. Johnson has never manipulated the results of a BASIS Assessment for any individual.  Neither Gordon Criswell nor anyone else from the Wyandotte County Developmental Disabilities Office or the Unified Government of Wyandotte County/Kansas City, Kansas has ever attempted to influence Ms. Johnson or manipulate the manner in which Ms. Johnson conducts the BASIS Assessments.

After the BASIS Assessment is complete, Ms. Johnson turns the form over to Olivia Salazar, Administrative Support Specialist for WCDDO. She does not have any further involvement with the BASIS Assessment after that point.

B.  Olivia Salazar – WCCDO Administrative Support Specialist

As soon as Olivia Salazar receives the BASIS Assessments from Ms. Johnson she enters the data into the computer system. Once the information is entered into the computer system Ms. Salazar then scans the BASIS Assessments and e-mails them to the providers.  Every Wednesday Ms. Salazar uploads the BASIS Assessment data to the Department of Social and Rehabilitation Services ("SRS") in Topeka.   SRS sends Ms. Salazar an e-mail when they are finished processing the BASIS Assessment data.  The BASIS Assessment data is scored electronically by SRS. This scoring system produces a tier rate for the individual. A tier rate of "0" indicates that the individual is not eligible for HCBS services. A tier rate of "1" is the highest level of funding eligibility and a tier rate of "5" is the lowest level of funding eligibility.  Ms. Salazar then downloads the "tier and score reports" for the individuals. The tier and score reports are then faxed to the affiliate associated with the individual.  The provider can call Ms. Salazar and get the tier rate for an individual as soon as she has the results.

Ms. Salazar has never manipulated the results of any BASIS Assessments or changed any data that she entered. She always enters the exact information that is contained on the BASIS Assessments. Ms. Salazar has never been asked by anyone to manipulate the results of any BASIS Assessments or to change the data that she enters.  Neither Gordon Criswell, Kay Forwalder-Fasching, nor anyone else from WCDDO or the Unified Government of Wyandotte County/Kansas City, Kansas has ever manipulated the results of the BASIS Assessments or changed any data that Ms. Salazar enters.

C. Greg Wintle – SRS Program Manager

Greg Wintle works for SRS. Mr. Wintle holds the position of State Program Manager for Services for Individuals with Developmental Disabilities. He has held this position for eleven years.   Mr. Wintle is responsible for the implementation and oversight of the Home and

Community Based Services ("HCBS") waiver for persons with mental retardation and/or developmental disabilities, which includes: (1) BASIS Assessments; (2) writing of the waiver and amendments; (3) annual reporting to the Centers for Medicare & Medicaid Services; (4) annual contracting with community developmental disabilities organizations; and (5) review and approval of requests for extraordinary funding.

Mr. Wintle's office receives BASIS Assessment data on a weekly basis from WCDDO. The data is uploaded to SRS on Wednesdays and downloaded by Mr. Wintle's office the next day.  If a provider disputes the results and the CDDO agrees that additional information should be considered, the CDDO can resubmit the BASIS Assessment once during the birth month of the individual and it will be re-scored by SRS. If it is outside the birth month of the individual then the CDDO must obtain permission from SRS to submit the additional information.

Mr. Wintle was involved in an investigation that SRS conducted in 2009 because of concerns raised by Mr. Brown. The investigation showed that the funding available to National Alliance had actually increased during the previous two year period.  Mr. Wintle has never seen any evidence to suggest that either Kay Forwalder-Fasching or anyone else at WCDDO has been manipulating the results of the BASIS Assessments or changing any data that is sent to SRS.

The SRS Investigation

Mr. Brown and National Alliance previously sent a complaint to the Centers for Medicare and Medicaid Services regarding WCDDO in the year 2009.  CMS forwarded the complaint to SRS for investigation.  During SRS's investigation, SRS staff met with Mr. Brown and WCDDO officials, they interviewed other providers and case managers, and they performed analysis utilizing data and other information provided.

After SRS's investigation, SRS prepared a report containing their findings in a document titled "SRS Report to CMS -- Wyandotte County CDDO Allegations", (the "SRS Report"). Margaret Zillinger, Director of the Community Supports & Services Division of SRS, sent the Report to CMS on September 15, 2009.  According to the SRS Report, National Alliance alleged that WCDDO manipulated portions of the BASIS Assessments in order to reduce funding available to National Alliance for supporting persons with mental retardation and/or developmental disabilities.

The SRS Report found no evidence to support the allegation that WCDDO had manipulated BASIS Assessments.  The SRS Report states: "SRS reviewed each individual case submitted and agrees with the decision made by the CDDO or determined there was not enough information provided to assess the issue."  The SRS Report found that there was an overall increase in available funding for National Alliance for the two years prior to the SRS Report. The SRS Report also found that among individuals being served by National Alliance in the prior two years there were 7 increases in tier levels, compared to 1 decrease in tier level and 6 tier levels that remained the same.

According to the SRS Report, National Alliance alleged that WCDDO steered persons away from National Alliance.  SRS found no evidence to support the allegation that WCDDO steered persons away from National Alliance.  The SRS Report states:  "Data for the past five years shows a net increase of 6 people that chose to move to National Alliance and away from another provider utilizing the CDDO's process."

SRS did require that certain changes be made, including: a provider listing added to WCDDO's website; development of a brochure that is shared annually with persons which includes information about providers, dispute resolution and people's rights; and a change in

how the information is communicated and shared.  SRS found only two instances in which National Alliance was not listed on a provider choice form. The SRS Report states:  "SRS believes that these instances were related to poor processes and management by the CDDO rather than a conspiracy to not include National Alliance. The changes that have been implemented with regard to the process of sharing this information in-person annually and having updated information on the website on an on-going basis should remedy these errors."

According to the SRS Report, National Alliance alleged that it was treated differently than other providers in the area due to overzealous actions by WCDDO and SRS when complaints were made about National Alliance. The SRS Report found no evidence to support the allegation that National Alliance was treated differently than other providers. The SRS Report states:  "The CDDO provided evidence of uniform quality assurance activities across its entire provider network. The specific examples that were provided by National Alliance to demonstrate favoritism or overzealous actions appeared to be routine follow-up on identified issues/complaints."

According to the SRS Report, National Alliance alleged that WCDDO did not fairly review challenges to BASIS scoring concerns.  The SRS Report states:  "SRS has reviewed each individual case submitted by National Alliance about BASIS scoring and found that the CDDO was correct in its decisions about the BASIS, or that the information provided was not sufficient to determine validity." The SRS Report states:  "SRS does not find that the CDDO acted with malice toward National Alliance."

Wyandotte County CDDO – CDDO Review Report

Coincidentally, 2009 was also the year that SRS conducted the semi-annual review of WCDDO that SRS conducts for all CDDO's in the State of Kansas. SRS held its review on

January 21st and 22nd of 2009 and thereafter released its "Wyandotte County CDDO – CDDO Review Report" (the "Review").  The Review found that WCDDO demonstrated impartiality; that WCDDO provided an informed choice of community service providers; that WCDDO maintained a strong quality assurance system; and that WCDDO maintained an effective dispute resolution system.

The Review found that one area where improvement was needed was relating to the monthly newsletter published by WCDDO. SRS found that the provider data needed to be more consistently applied. Since the Review, WCDDO has added a specific section in the newsletter where all provider information is located.

<u>The Dispute Resolution Process</u>

Kansas Administrative Regulation 30-64-32 sets forth the dispute resolution and appeals process for handling disputes between community service providers and CDDO's.   The regulation provides that each CDDO must develop and implement a dispute resolution procedure that "provide[s] a means for resolving disputes that may arise between…[t]he CDDO and any affiliated community service provider."

WCDDO has implemented Policy 32-4, titled "Dispute Resolution: Affiliated Provider Disputes With The CDDO."  Together, K.A.R. 30-64-32 and Policy 32-4 set forth the dispute resolution procedures for community service providers to follow.  The first step in the dispute resolution process is to have the community service provider meet with WCDDO and anyone else with knowledge of the action being disputed to determine if the dispute can be solved informally without intervention.  Next, if the dispute cannot be resolved informally and without intervention, the community service provider has the right to request intervention by a mediator. The provider may decline to enter into mediation and instead may request that the dispute be

referred to the governing board of the CDDO, or their designee. The County Administrator of the Unified Government has been designated to hear these disputes.

The provider then has the right to appeal the decision of the County Administrator or his or her designated hearing officer to the SRS division of mental health and developmental disabilities ("SRS-DBHS/CSS") within 10 days of the receipt of the decision. Finally, any decision by SRS-DBHS/CSS may be appealed to the Office of Administrative Appeals within the Kansas Department of Administration.

Plaintiffs have never followed the dispute resolution process past the very first step (i.e., informal discussions with WCDDO) as required by K.A.R. 30-64-32 and WCDDO Policy 34-2. On at least three occasions, Plaintiffs have attempted to take their dispute directly to CMS rather than follow the dispute resolution process.

According to the SRS Report, National Alliance alleged that SRS did not respond to appeal requests of WCDDO decisions that were documented by certified mail receipt.  The SRS Report states: "SRS Community Supports and Services division has no record of ever receiving the certified mail appeal requests."

Plaintiffs' claimed damages

At the September 7, 2011 deposition, Mr. Brown admitted that he was ultimately reimbursed for all of the submitted payments.  Mr. Brown stated that "[a]fter challenging the CDDO and giving them time to correct it, working with the case manager, we talked with Kaye Forwalder-Fasching" and he was reimbursed for all of the submitted payments.  The Pretrial Order was amended to reflect the fact that Plaintiffs had been reimbursed for all of their submitted payments.  Mr. Brown stated that he incurred expenses in relation to challenging the funding with WCDDO in the form of bank overdrafts, borrowing money to pay salaries, interest

and late fees. Mr. Brown stated that documentation of his damages would be "forthcoming," but did not provide any additional documentation to Defendants.

Mr. Brown claims that the tier rates for specific individuals had been manipulated by Defendants. Both Mr. Wintle and Ms. Forwalder-Fasching aver, through their uncontroverted affidavits, that the tier rates for each of those individuals named by Mr. Brown either went up or stayed the same from 2007 to 2009.

One individual was scored at a tier rate of 3 by SRS in 2008. National Alliance disputed this individual's BASIS Assessment with WCDDO in 2009, and WCDDO agreed that the BASIS Assessment should be rescored. The rescore by SRS resulted in an increase in the tier rate from 3 to 1 in the year 2009.

Mr. Brown stated that Gordon Criswell acted with "evil intent or reckless and callous indifference" because he would "[c]ome into my office after his staff didn't like something that she felt was in error, he just came evilly so and began to demand of me what was going on. Coming into my office with an investigation that I wasn't aware of. Following my staff." Plaintiffs contend that "[i]n multiple conversations with Plaintiff Mr. Criswell has been combative and defensive, and some of the unfair treatment to Plaintiff could be seen as retaliation to Plaintiff's repeated complaints."  Mr. Brown does not have any information to suggest that Mr. Criswell has been involved in the manipulation of BASIS Assessment data.

**IV.  Discussion**

> **A.  Fourteenth Amendment Equal Protection Claim**

To succeed on a Fourteenth Amendment equal protection claim, Plaintiffs must show either that they are part of an identifiable group or are a "class of one" which is intentionally treated differently from others similarly situated with no rational basis for the difference in

treatment.[24]  Plaintiffs contend they fall within the "class of one" category.  Under this theory, the Plaintiffs "must prove that they were 'singled out for persecution due to some animosity,' meaning that the actions [of Defendants] were a 'spiteful effort to "get" [the Plaintiffs] for reasons wholly unrelated to any legitimate state activity."[25]  "[A] class-of-one plaintiff must show that the official action was *objectively* irrational and abusive."[26]  In addition, the Plaintiffs must prove that they were treated differently than those similarly situated.[27]

At the outset, Defendants note that the United States Supreme Court has limited the application of the class-of-one theory in *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591 (2008).  In that case, the court found that the class-of-one theory of equal protection does not apply in the public employment context.  In so concluding, the court reasoned that there are some forms of state action, which, by their nature, involve discretionary decision-making based on a vast array of subjective, individualized assessments. In such cases, "treating like individuals differently is an accepted consequence of the discretion granted" to governmental officials.[28]

Defendants argue for this Court to extend the holding of *Engquist* into the arena of governmental officials' discretionary decisions regarding tier rates and funding of community care providers for the disabled.  Defendants contend that because the BASIS Assessment process requires individualized assessments about individuals' levels of care, the process necessarily involves subjective and discretionary decision-making akin to that considered in *Engquist*. Therefore, their argument proceeds, this Court should hold that the class-of-one equal protection

---

[24]  *Mimics, Inc. v. Village of Angel Fire*, 394 F.3d 836, 848-49 (10th Cir. 2005) (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)(per curiam)).

[25]  *Id.* at 849 (citing *Bartell v. Aurora Pub. Sch.*, 263 F.3d 1143, 1149 (10th Cir. 2001)(quotation omitted)).

[26]  *Jacarilla Apache nation v. Rio Arriba County*, 440 F.3d 1202, 1211 (10th Cir. 2006)(emphasis in original).

[27]  *Mimics* at 849.

[28]  *Engquist v. Oregon Dept. of Agriculture*, 553 U.S. 591, 603 (2008).

theory does not apply here, and accordingly must find that Plaintiffs fail to state a claim on which relief can be granted.[29]

This Court declines Defendants' invitation to so hold.  While governmental officials' decisions regarding funding and tier rates for community care providers may well be the types of discretionary decisions that fall within the realm of state action based on a "vast array of subjective, individualized assessments" so as to properly fall outside the ambit of the class-of-one equal protection theory, this Court need not decide the question.  This Court finds that even assuming Plaintiffs have properly stated a class-of-one equal protection claim, summary judgment in favor of Defendants must necessarily be granted.

Based upon a review of the entire record, and viewing the record in the light most favorable to Plaintiffs, the Court finds that Defendants, as the parties moving for summary judgment, have met their burden of pointing out to the Court a lack of evidence on an essential element of Plaintiffs' class-of-one equal protection claim.  Specifically, Defendants note the dirth of evidence in the record that Plaintiffs were "singled out for persecution due to some animosity" and that the Defendants' actions were "objectively irrational and abusive" and taken out of "animosity or spite" to "get" Plaintiffs for reasons wholly unrelated to any legitimate state activity.[30]

Plaintiffs attempt to meet their burden by alleging that Mr. Criswell was "motivated by evil intent, or alternatively, a reckless or callous indifference to Plaintiffs' right to equal treatment under the law."[31]  Plaintiffs also claim that "[i]n multiple conversations with Plaintiff Mr. Criswell has been combative and defensive, and some of the unfair treatment to Plaintiff

---

[29]  *See* Defendants' Brief in Support of Summary Judgment, ECF No. 74 at 28.
[30]  *See Jacarilla*, 440 F.3d at 1211; *Mimics*, 394 F.3d at 848-49.
[31]  Pretrial Order entered December 12, 2011 at 6, ¶ 5(a)(10).

could be seen as retaliation to Plaintiff's repeated complaints."[32]   Plaintiffs concede, however, that they have no information to suggest the Mr. Criswell has been involved in manipulation of any data.[33] These allegations, without more, fail to meet Plaintiffs' substantial burden.   Plaintiffs argue it is not their burden at this juncture to present affidavits or testimony:  "Plaintiffs have listed multiple witnesses that *can* support their claims, though the affidavits and/or testimony of those witnesses *are not required at this stage of the litigation*."[34]  Plaintiffs have misapprehended their burden at this stage of the proceedings.   Given that Defendants have met their burden as movant to properly support their motion by showing the absence of genuine issues of fact, the burden now shifts to the nonmoving party, "who may not rest upon the mere allegation[s] . . . of his pleading, but must set forth specific facts showing there is a genuine issue for trial."[35]   A party opposing summary judgment "cannot rely on ignorance of facts, on speculation, or on suspicion"[36] and must "do more than show there is some metaphysical doubt as to the material facts."[37]

Plaintiffs, in attempting to demonstrate issues of fact for trial, have submitted with their response two documents -- an affidavit of VeVe Brown, plaintiff James Brown's daughter and Assistant Director for National Alliance, and four pages excerpted from James Brown's deposition.  The Court has carefully reviewed both documents, and finds no evidence in either Ms. Brown's affidavit or Mr. Brown's deposition to support a factual inference that any of Defendants' actions were taken out of "animosity or spite" to "get" Plaintiffs for reasons wholly unrelated to any legitimate state activity.

---

[32]  Response to Defendants' First Interrogatories, at 15, ¶ 8.

[33]  *See* Plaintiff James Brown's deposition ECF No. 81-2 at 26, ll. 18- 21.

[34]  Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment, ECF No. 81, at 9-10 (emphasis added).

[35]  *Muck* 3 F.3d at 1380.

[36]  *Conaway*, 853 F.2d at 793.

[37]  *Matsushita*, 475 U.S. at 586-87.

Indeed, the Court has culled through the entire record, and finds nothing in the materials cited by either party to establish the presence of a genuine dispute as to whether Defendants' actions toward Plaintiffs, in administering the system of funding, were "objectively irrational and abusive" and done out of animosity or spite to single out Plaintiffs for persecution.  The uncontroverted facts show that both the funding available to Plaintiffs and the number of individuals choosing their services have actually increased in recent years.  SRS conducted an independent investigation of Plaintiffs' allegations in which they confirmed these facts and cleared WCDDO of any wrongdoing.  Indeed, the investigation specifically concluded that "SRS does not find evidence that the CDDO acted with malice toward National Alliance."  Moreover, Defendants have provided the affidavits of each individual involved in the BASIS Assessment process – including the independent BASIS Assessor, the individual who enters the data, and the SRS official who oversees the BASIS Assessment program – and each of these individuals confirmed that there is no manipulation occurring.  The allegations made by Plaintiffs simply constitute speculation and are insufficient to withstand summary judgment.

In addition, the Court finds that Plaintiffs have failed to produce any evidence to create a question of fact as to whether Plaintiffs were treated differently from other community care providers.  While National Alliance alleged that it was "treated differently than other providers in the area by overzealous [W]CDDO and SRS actions when complaints [were] made about National Alliance,"[38] SRS found no evidence to support these allegations.  The SRS Report states: "The CDDO provided evidence of uniform quality assurance activities across its entire provider network. The specific examples that were provided by National Alliance to demonstrate favoritism    or    overzealous    actions    appeared    to    be    routine    follow-up    on    identified

---

[38]  *See* SRS Report at 4, attached as Ex. 1 to Margaret Zillinger's affidavit.

issues/complaints.   SRS' licensing process is a year round endeavor and when issues are identified the amount of monitoring increases, and this is a uniform practice statewide."[39]

In sum, the uncontroverted  facts establish that Mr. Criswell did not violate Plaintiffs' equal protection rights. The Unified Government, as a municipality, cannot be held liable under 42 U.S.C. § 1983 when there is no underlying constitutional violation.[40] Finally, WCDDO is a subordinate agency within the Unified Government and therefore does not have the capacity to sue or be sued.[41] Summary judgment is therefore granted in favor of Mr. Criswell, the Unified Government, and WCCDO on Plaintiffs' equal protection claim.

**B.  State Law Claim under KDDRA, K.S.A. § 39-1801, et seq.**

Defendants next argue that Plaintiffs failed to follow the dispute resolution procedure established by administrative regulation for the KDDRA, and thus Plaintiffs have failed to exhaust their administrative remedies with respect to any allegations involving violations of the KDDRA.  Therefore, they contend, the Court lacks subject matter jurisdiction over the Plaintiffs' state law claims, and summary judgment should be granted in favor of Defendants.

It is uncontroverted that Kansas Administrative Regulation 30-64-32 sets forth the dispute resolution and appeals process for handling disputes between community service providers and CDDO's.  The regulation provides that each CDDO must develop and implement a dispute resolution procedure that "provide[s] a means for resolving disputes that may arise between…[t]he CDDO and any affiliated community service provider."  WCDDO has fulfilled this duty by implementing Policy 32-4, titled "Dispute Resolution: Affiliated Provider Disputes With The CDDO." Therefore, K.A.R. 30-64-32 and Policy 32-4 jointly provide for the following dispute resolution procedures:

---

[39]  *Id.*

[40]  *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *see also Jennings v. City of Stillwater*, 383 F.3d 1199, 1205 n.1 (10th Cir. 2004).

[41]  *See Fugate v. Unified Government of Wyandotte County/Kansas City, Kansas*, 161 F.Supp.2d 1261, 1266 (D. Kan. 2001)(holding that the Wyandotte County Sheriff's Office did not have the capacity to sue or be sued).

The first step is to have the community service provider meet with WCDDO and anyone else with knowledge of the action being disputed to determine if the dispute can be solved informally without intervention.  Next, if the dispute cannot be resolved informally and without intervention, the community service provider has the right to request intervention by a mediator.  The provider may decline to enter into mediation and instead request that the dispute be referred to the governing board of the CDDO, or their designee.  In the present case, the County Administrator of the Unified Government has been designated to hear these disputes.  The provider then has the right to appeal the decision of the County Administrator or his or her designated hearing officer to the SRS division of mental health and developmental disabilities ("SRS-DBHS/CSS") within 10 days of the receipt of the decision.  Finally, any decision by SRS-DBHS/CSS may be appealed to the Office of Administrative Appeals within the Kansas Department of Administration.

Applying this dispute resolution procedure to the facts, Defendants assert that the first step in the dispute resolution process is for the community service provider to hold informal discussions with WCDDO. If WCDDO determines that the original BASIS Assessment was missing information that should have been considered by SRS or if substantial changes have occurred in the individual's level of care since the BASIS Assessment was conducted, then WCDDO will request permission from SRS to resubmit the information and SRS will produce an updated score. If WCDDO determines that the original BASIS Assessment had the correct information and does not need to be rescored, the community service provider may appeal that decision to the next step in the dispute resolution process. Additional steps in the dispute resolution process include reviews by: (1) an independent mediator; (2) the County Administrator; (3) SRS; and finally (4) the Office of Administrative Appeals in Topeka.

Plaintiffs admit that they failed to follow this comprehensive dispute resolution process past the very first step (*i.e.*, informal discussions) as required by K.A.R. 30-64-32 and Policy 34-

2.  At times, Plaintiffs appear to have tried to circumvent the dispute resolution process by writing directly to CMS with their disputes. However, those actions do not comply with the dispute resolution process and are insufficient to exhaust Plaintiffs' administrative remedies. For these reasons, the Court concludes that it lacks subject matter jurisdiction over Plaintiffs' state law claim, and summary judgment should be granted in favor of Defendants.

Moreover, even if Plaintiffs had properly exhausted their administrative remedies, in light of the Court's determination that Defendants are entitled to summary judgment on Plaintiffs' federal equal protection claim, the court, in its discretion, would decline to exercise supplemental jurisdiction over Plaintiffs' state law claim.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (ECF No. 73) is granted.

**IT IS FURTHER ORDERED** that Defendant's Motion in Limine (ECF No. 90) should be and hereby is denied as moot.

**IT IS SO ORDERED.**

Dated in Kansas City, Kansas, on this 22nd day of March 2012.

<u>s/ David J. Waxse</u>
David J. Waxse
United States Magistrate Judge

cc:     All counsel